**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JASCKSON HEWITT INC.,**<br><br>         **Plaintiff,**<br><br>**v.**<br><br>**COLLINS NJOKU,**<br><br>             **Defendant.** | Civ. No. 21-7556 (KM)(ESK)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Jackson Hewitt Inc. ("Jackson Hewitt") grants franchises to operate income tax preparation businesses under its well-known name. Defendant Collins Njoku is a former Jackson Hewitt franchisee. Jackson Hewitt and Njoku entered into a franchise agreement for the operation of a Jackson Hewitt tax preparation business in East Elmhurst, New York. Jackson Hewitt alleges that, during the course of that contractual agreement, Njoku failed to fulfill certain obligations, including the obligation to remit payments required under the terms of the franchise agreement. In response, Jackson Hewitt terminated the franchise agreement between the parties. Jackson Hewitt further alleges that Njoku failed to comply with certain post-termination obligations, including (1) not operating a competing tax preparation business within ten miles of his former franchised territory; (2) returning all Jackson Hewitt proprietary and confidential information associated with Njoku's franchise; and (3) paying Jackson Hewitt all fees due and owing under the franchise agreement.

## I.    Procedural Background

On March 31, 2021, Jackson Hewitt filed its Complaint against Mr. Njoku, asserting five claims:

**Count 1**: Misappropriation of trade secrets in violation of the Economic Espionage Act as amended by the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.*, related to Njoku's alleged retention of confidential customer information and records (Compl. ¶¶71-77); [1]

**Count 2**: Breach of contract – post termination obligations regarding trade secrets and confidential and proprietary information (Compl. ¶¶78-81)

**Count 3**: Breach of contract – covenant not to compete (Compl. ¶¶83-90)

**Count 4**: Breach of contract – covenant not to solicit customers (Compl. ¶¶91-98)

**Count 5**: Breach of contract – unpaid amounts (Compl. ¶¶99-104)

On April 5, 2021, Jackson Hewitt filed a motion (DE 4) for an Order to Show Cause why the following relief should not be entered:

---

[1]     Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"Compl." = Plaintiff's Complaint (DE 1)

"Njoku Dep." = Deposition of Defendant Collins Njoku (DE 29-1)

"Njoku Decl." = Declaration of Defendant Collins Njoku (DE 23-1)

"Harrison Decl." = Deposition of Meghan Harrison, Vice President, Integration and Franchise Operations for Jackson Hewitt (DE 4-2)

"Doorly Decl. 1" = First Declaration of Kevin Doorly, District Manager, Operations for Jackson Hewitt (DE 4-6)

"Doorly Decl. 2" = Second Declaration of Kevin Doorly, District Manager, Operations for Jackson Hewitt (DE 25-2)

"Gwathney Decl. 1" = First Declaration of Frank Gwathney, Director, Internal Audit for Jackson Hewitt (DE 4-8)

"Gwathney Decl. 2" = Second Declaration of Frank Gwathney, Director, Internal Audit for Jackson Hewitt (DE 25-3)

"Edidong Njoku Dep." = Deposition of Edidong Njoku (DE 27-2)

"Franchise Agreement" = Franchise Agreement between Jackson Hewitt and Njoku (DE 4-3)

(a) preliminarily enjoining and restraining defendant Collins Njoku, and his relatives, employees, agents, servants and/or representatives, and all those who act in concert or participation with them, from preparing or electronically filing individual income tax returns, offering financial products, or participating in any way in a competing tax business within the territory under Njoku's terminated franchise agreement, and within ten miles of the boundaries of the territory under the terminated franchise agreement, until two years from the date of this Court's Order;

(b) preliminarily enjoining and restraining Njoku, and his relatives, employees, agents, servants, attorneys and/or representatives, and all those who act in concert or participation with them, from soliciting any persons who were customers of Njoku's former franchised Jackson Hewitt location at the time of termination or during the year prior to termination of the franchise agreement, until two years from the date of this Court's Order; and

(c) compelling Njoku to immediately provide to Jackson Hewitt all originals and copies of all trade secret and confidential Jackson Hewitt information and client files, including paper copies of customer tax returns and all customer lists and contact information, without retaining copies.

The Court signed the Order to Show Cause (DE 7), and the parties engaged in expedited discovery.

On April 30, 2021, the Court held an evidentiary hearing on the preliminary injunction application. The parties stipulated to the presentation of certain direct testimony by affidavit. At the hearing, each party made available the witness or witnesses the other side wished to cross-examine. After the hearing, the parties stipulated to the return of all Jackson Hewitt confidential and proprietary files. (DE 31). As a result, Counts 1 and 2 of the Complaint were rendered moot, and the relief concerning return of confidential and proprietary files ((c), *supra*), although litigated at the hearing, was likewise

3

rendered moot. Essentially, the preliminary injunction analysis herein is based on Counts 3 and 4 (post-termination noncompetition and nonsolicitation).

For the reasons provided herein, I will for the most part **grant** Jackson Hewitt's request for preliminary relief and will enter an order:

(a) preliminarily enjoining and restraining defendant Collins Njoku, and his relatives, employees, agents, servants and/or representatives, and all those who act in concert or participation with them, from preparing or electronically filing individual income tax returns, offering financial products, or participating in any way in a competing tax business within the territory under Njoku's terminated franchise agreement, and within ten miles of the boundaries of the territory under the terminated franchise agreement, until **eighteen months** from the date of **May 18, 2021**; and

(b) preliminarily enjoining and restraining Njoku, and his relatives, employees, agents, servants, attorneys and/or representatives, and all those who act in concert or participation with them, from soliciting any persons who were customers of Njoku's former franchised Jackson Hewitt location at the time of termination or during the year prior to termination of the franchise agreement, until **eighteen months** from the date of **May 18, 2021**.

## II. Facts

### a. The Franchise Agreement

On or about October 25, 2007, Jackson Hewitt and Njoku entered into a franchise agreement for the license and operation of an income tax return preparation business within a defined geographical area of New York. (Collins Dep. at 42; Harrison Decl. ¶19). Njoku's franchise office was located in East Elmhurst, in the borough of Queens, New York. (Doorly Decl. 2 ¶3; Njoku Decl. ¶4). Pursuant to the terms of the franchise agreement, Njoku was obligated to pay Jackson Hewitt royalty, advertising, and other fees. (Harrison Decl. ¶24).

Jackson Hewitt submits that Njoku failed to fulfill those financial obligations. (*Id.*) In August 2019, Mr. Frank Gwathney, Director, Internal Audit

for Jackson Hewitt, "coordinated an audit of Njoku's operations and revenue reporting due to significant abnormalities in his reporting, including a very large volume of returns that were reported as extremely discounted." (Gwathney Decl. 2 ¶6). For example, Njoku reported that he charged "only $18.00" for "many" of his tax returns. (*Id.*). Based upon that audit, Jackson Hewitt determined that Njoku was underreporting his revenue, and, as a result, failing to properly calculate and pay royalty, advertising, and marketing fees. (Gwathney Decl. 2 ¶9). The audit also revealed that Njoku had created additional Electronic Filer Identification Numbers ("EFINs") and used "those EFINs to prepare and file tax returns outside of Jackson Hewitt's authorized tax preparation software," which is named ProFiler®. (*Id.*)

The franchise agreement, first entered into in 2007, expired on or around October 25, 2017, and continued month-to-month thereafter. (Harrison Decl. ¶¶21-22). After "numerous notices of default and opportunities to cure," Jackson Hewitt terminated the franchise agreement in November 2019. (DE 4-4 (Termination Notice); Harrison Decl. ¶¶24-25). In one such notice of default, Jackson Hewitt memorialized that Njoku had orally admitted to underreporting his revenue. (Gwathney Decl. 2 ¶11; DE 25-6 ("During the course of our audit of your Franchised Business, while gaining an understanding of your Gross Volume of Business reporting practices, you admitted to recording discounted tax preparation fees for tax returns prepared without an Assisted Refund via ProFiler® during the 2018 and 2019 Tax Seasons, despite actually collecting tax preparation fees in an amount greater to the recorded amount, with the purpose of inaccurately reporting actual revenue collected from customers.")).[2]

Njoku denied that he had underreported revenue and denied admitting he had done so. Njoku submits that, while operating under the Jackson Hewitt

---

[2]     Jackson Hewitt also arranged for the use of a "mystery shopper"—*i.e.,* an undercover operative posing as a customer, who engaged Njoku's tax preparation services. This customer's transaction produced evidence of Njoku's "application of an inappropriate fee adjustment and intentional underreporting of revenue received by Njoku from this customer," corroborating the audit. (Gwathney Decl. 2 ¶12).

franchise, he provided services at a price that his customer base could afford and "would often charge between $50 and $100 per item." (Njoku Decl. ¶5). Njoku further submits that, in about 2015, Jackson Hewitt began demanding that he "charge an average price of $250 for each tax return prepared" and enforced that average price by using it as the basis for royalty fees. (Njoku Decl. ¶¶6-7).

When an audit reveals underreporting of a franchisee's revenue, "Jackson Hewitt calculates amounts owed using the franchisee's own Average Net Tax Preparation Fee for each respective Tax Year included in the scope of the audit." (Gwathney Decl. 2 ¶14). By way of example, on August 14, 2019, Mr. Gwathney messaged Njoku regarding a "list of discounted returns for tax years 2016, 2017, and 2018" and asked Mr. Njoku to provide an explanation for those discounted rates. (DE 25-5 at 5). For the returns that Njoku could not provide an explanation, Njoku instructed Mr. Gwathney to "use [the] average fee." (DE 25-5 at 2).

On November 25, 2019, Jackson Hewitt sent Njoku a Notice of Termination of the Franchise Agreement which demanded, *inter alia*, that Njoku: "(1) pay Jackson Hewitt all past due amounts, which included additional amounts determined based on an audit, and (2) comply with all post-termination obligations under the Franchise Agreement." (Harrison Decl. ¶¶25-26).

Njoku's post-termination obligations included the following covenants:

(a) pay all amounts owed under the Franchise Agreement and all Collateral Agreements;

(b) pay all money owed to third parties in connection with the Franchise Business;

(c) return to Jackson Hewitt all original copies of all trade secret and confidential Jackson Hewitt information and client files, without retaining copies, and provide Jackson Hewitt access to remove all copies of such items from his office, including deleting all confidential materials and client files from his computers and hard drives;

(d) return to Jackson Hewitt or destroy all literature, sign facings and unused advertising materials bearing the Jackson Hewitt Marks;

(e) stop using all Jackson Hewitt Marks and any colorable imitation of them;

(f) notify the telephone company and all listing agencies and advertising directories for the territories that Njoku no longer has the right to use such telephone numbers and listings, and authorizing the transfer of same to Jackson Hewitt;

(g) cease identifying as a present or former Jackson Hewitt franchisee or franchise owner;

(h) comply with the post-termination covenants contained in section 18 of the Franchise Agreement, and with any other covenants that require performance after he is no longer a Jackson Hewitt franchise;

(i) cancel all fictious or assumed name filings; and

(j) return all leased equipment.

(Harrison Decl. ¶27).

Additionally, the franchise agreement contained a covenant not to compete, which provided that, for a period of two years after the effective date of his termination, Njoku could not

> directly or indirectly prepare or electronically file individual income tax returns, teach tax courses, offer Financial Products or own, engage in, operate, manage, purchase, invest in . . ., franchise, lend money to, lease or sublease to, or agree to sell or sell all or a majority of the assets of the Franchised Business to any Competing Tax Business . . . within the Territory or within an area ten (10) miles outside the boundaries of the Territory.

(Harrison Decl. ¶28). "Competing Tax Business" is defined as "any business that offers tax return preparation, electronic filing, Financial Products or other services that are the same or similar to those offered by Jackson Hewitt Tax Service businesses." (Harrison Decl. ¶29).

The agreement further provided that, for a period of two years following his termination, Njoku could "not directly or indirectly solicit any person who is or was, on the date of termination or within one (1) year prior to the date of

termination, a customer of his franchised Jackson Hewitt location." (Harrison Decl. ¶32). Njoku acknowledged in the agreement that its terms, including the covenant not to compete, were reasonable and would not impose an undue hardship because Njoku has "other skills, experience or education that will afford [him] the opportunity to derive income from other endeavors." (Harrison Decl. ¶33 (alteration in original)).

The franchise agreement also set forth Jackson Hewitt's right to obtain temporary and permanent injunctive relief in the event of a breach. (Harrison Decl. ¶44).

### b. Njoku's Alleged Breach of Post-Termination Provisions

Jackson Hewitt alleges that Njoku breached the post-termination non-competition and non-solicitation obligations and failed to return confidential and proprietary materials.[3] (Harrison Decl. ¶¶ 34-42).

Jackson Hewitt submits that Njoku "is directly or indirectly engaged in a Competing Tax Business within his former territory." (Harrison Decl. ¶34). On or about January 17, 2020, Jackson Hewitt, by and through counsel, sent Njoku a cease-and-desist letter demanding that he, and anyone acting in concert with him, cease using Jackson Hewitt's marks and operating a competing tax business within the former franchise territory. (Harrison Decl. ¶35).

Njoku does not dispute that he is engaged in a competing tax business. Instead, he submits that Jackson Hewitt was "aware ever since the time that it terminated the Franchise Agreement, [that Njoku] ha[s] continued to support [his] family by engaging in the tax preparation business." (Njoku Decl. ¶13). For most of the year 2020 and into year 2021, Njoku operated a tax preparation business "in the Highbridge section of the Bronx," which Njoku submits is "not

---

[3]      The parties disputed the facts surrounding Jackson Hewitt's recovery of its confidential and proprietary materials. As explained, however, the issues regarding Njoku's retention of Jackson Hewitt materials has since been handled by way of stipulation. (DE 31). I have considered the testimony regarding that issue, however, in connection with Mr. Njoku's credibility. *See infra.*

only many miles from the East Elmhurst location," but is "in an entirely separate borough and neighborhood." (Njoku Decl. ¶20). However, Njoku's wife, Edidong "Didi" Njoku, testified that the Highbridge location is "about eight to nine miles" from the East Elmhurst location. (Edidong Njoku Dep. at 15). According to Google Maps, the Highbridge location is 8.4 miles from the East Elmhurst location. It is therefore within the ten-mile noncompete radius imposed by the agreement.

Jackson Hewitt submits that Njoku removed the Jackson Hewitt exterior signage at the East Elmhurst location following the cease-and-desist letter and stated that he had returned or destroyed all client files. (Harrison Decl. ¶36). Thus, Jackson Hewitt submits that it believed Njoku was taking steps to comply with the post-termination covenants. (*Id*.). However, in December 2020, when the Electronic Return Originator ("ERO") data became available from the Internal Revenue Service for the full 2020 tax year, Jackson Hewitt learned that 900 tax returns had been prepared and filed under EFIN numbers associated with Njoku and his spouse, Didi Njoku, within the area proscribed by the post-termination non-compete provision. (Gwathney Decl. 1 ¶4). At the hearing, Njoku testified that he used his wife's EFIN number in 2020 and 2021 because the number was available, and he did not want to use the EFIN associated with his operations as a Jackson Hewitt franchisee. In 2021, Njoku resumed tax preparation services in his former East Elmhurst office building. (Njoku Dep. at 28).

There does not appear to be any claim that Ms. Njoku in fact engaged in the preparation or filing of tax returns. Jackson Hewitt contends that Ms. Njoku did not file a single return in 2018 or 2019 using the EFIN under her name, but that some 900 returns were filed under that number in 2020. (Gwathney Decl. 1 ¶¶4-5). Mr. Njoku prepared approximately 1000 returns during 2018 and 2019. (Gwathney Decl. 1 ¶5). Gwathney declares, based on his familiarity with ERO data, "that it would be highly unusual, if not unheard of, for a new tax preparer to prepare more than 850 accepted tax returns during their first year using an EFIN." (Gwathney Decl. 1 ¶6). In his opinion,

9

and considering "that 'Didi Njoku' and Njoku share a common address and phone number, it appears that 'Didi Njoku' registered for a new EFIN in order to directly or indirectly process returns for Njoku during the 2020 tax season." (*Id.*). Further, Gwathney attested that the returns associated with Ms. Njoku's EFIN in 2020 "are likely related to the returns prepared by Njoku in 2018 and 2019." (*Id.*) Mr. Njoku did not claim that his spouse had in fact prepared or submitted any tax returns; rather, he claimed that he had used her EFIN as a convenience. *See supra.*

### c. Credibility

Although I discuss the factual issues in more detail herein, I make the following general observations about credibility at the outset.

As noted, the parties agreed to submit much of the evidence by affidavit, supplementing with deposition transcripts and exhibits. Each side was afforded the option to cross-examine any of the other side's witnesses. At the hearing, two witnesses were cross-examined: Mr. Gwathney and Mr. Njoku. Both of these witnesses, of course, represent parties to the case, and are not disinterested. In the course of the hearing, I had the opportunity to observe the demeanor of those witnesses and assess their credibility. In doing so, I considered such usual factors as the witnesses' apparent ability to recall; their general affect and demeanor; the apparent influence of bias or interest in shaping the narrative; the inherent plausibility of the accounts; and the extent to which their testimony fit with other evidence. The first two factors were fairly neutral as between the two; the last three, as explained, tipped toward Mr. Gwathney.

I have reviewed all exhibits, but have cited only those that appeared particularly important; many merely confirmed testimony that was not substantially in dispute. Some exhibits and affidavits contained plausible accounts that the plaintiff did not seek to challenge on cross-examination, and I have generally credited them.

10

For the most part, I have accepted Jackson Hewitt's version of the facts. Mr. Gwathney appeared largely in the capacity of an auditor. As such, he evinced no particular emotional or other investment in shaping the narrative. Much of his testimony concerned matters that could presumably be verified or disproven by documents, but Mr. Njoku often rested on bare denials. I consider, for example, the evidence of tax returns prepared outside the Jackson Hewitt system; if this had not occurred, it should have been easy to demonstrate this. Likewise, I consider the unchallenged evidence of filing of tax returns under an EFIN associated with Mr. Njoku's spouse, who is not a tax preparer but a nurse (Edidong Njoku Dep. at 9).

Gwathney's testimony largely reflected the results of an audit. That audit appears to have employed regularized professional standards. It resulted in a finding that Njoku was reporting implausible results that were out of line with what Jackson Hewitt is accustomed to seeing from its franchisees. Certain claims—such as the one that many returns were being prepared for fee of $18—seem quite extraordinary, even taking into account a low-income clientele. In short, Gwathney's account was coherent and plausible, and it was supported by several interweaving strands of evidence uncovered by his audit. The experience of the "mystery" undercover customer corroborated Mr. Njoku's underreporting *modus operandi.*

Mr. Njoku's account had credibility problems. His source of potential bias went directly to his livelihood, and so was perhaps a bit more potent than that of Mr. Gwathney. His account, as noted, contained some improbable elements. Although the issue of the return of Jackson Hewitt's records was abandoned after the hearing, he harmed his credibility with his version of what occurred in that connection.[4] The "resale price maintenance" claim that

---

[4]     Njoku, in his declaration, stated that Doorly came to his premises for a post-termination inspection. Njoku at one point said he gave Doorly only the "current customer files," because Doorly "did not want copies of the 2007 through 2018 files." (Njoku Decl. ¶ 15). At his deposition, Njoku testified that he probably gave Doorly the files for 2015 through 2017, but could not recall exactly. (Njoku Dep. 38). But Njoku had two other explanations. He could not, he said, turn over files because he was

Jackson Hewitt required him to charge $250 per return I find to be a gross exaggeration based on a small grain of truth—*i.e.,* that when Njoku failed to report the amounts he charged, Jackson Hewitt (with his consent) used an average figure to calculate fees and royalties. Other examples are noted herein.

## III. Discussion

### a. Legal Standard

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). In order to obtain a preliminary injunction, the moving party must show the following:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*,

---

required by law to retain files for a certain period (raising a question as to why he turned over any files at all, or why he did not retain the most recent files and turn over the older ones). He also testified that Doorly left behind files only because they would not fit in his vehicle. (Njoku Dep. 40) The inconsistencies are obvious. [cont'd]

Far more credible and coherent was the account of Doorly in his declaration. His mission, he explained, was to perform a post-termination inspection and recover all the Jackson Hewitt files from this terminated franchisee. He went to Njoku's East Elmhurst location on January 17, 2020 for that purpose. (Doorly Decl. 1 ¶4). Njoku provided him with client files from 2015 and 2016 only. (Id. ¶6). When asked, Njoku informed Doorly that "all files for 2017, 2018, 2019 had been shredded." (Id.). Doorly stated that if he "had seen other boxes of tax returns in [Njoku's] office, [he] would have taken those as well." (Doorly Decl. 2 ¶9). "[I]f the volume was more than [he] could fit in [his] vehicle that day, [he] would have arranged to come back and pick up the other boxes of tax files." (*Id.*).

Doorly's account frankly accords with common sense and what one would expect Jackson Hewitt to do. Njoku's conflicting explanations do not add up.

501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. "While each factor need not be established beyond doubt, they must combine to show the immediate necessity of injunctive relief." *Cmty. Servs. v. Heidelberg Twp.*, 439 F. Supp. 2d 380, 395 (M.D. Pa. 2006).

### b. Factor one: Likelihood of success on the merits

Jackson Hewitt submits that Njoku violated the post-termination covenants by operating a competing tax business within a ten-mile radius of his former franchise location and, as of 2021, resumed operating a tax preparation business at his former franchise location in East Elmhurst. (DE 4-1 at 18). Additionally, Jackson Hewitt submits that Njoku, or those acting in concert with him, breached the franchise agreement's covenant not to solicit former franchise customers. (*Id.*)

The franchise agreement is governed by New Jersey law. (Franchise Agreement § 28.1). To state a prima facie case for breach of contract under New Jersey law, a plaintiff must establish:

(1) "that the parties entered into a contract containing certain terms"; (2) "that [the plaintiff] did what the contract required [her] to do"; (3) "that [the defendant] did not do what the contract required [it] to do, defined as a breach of the contract"; and (4)

"that [the defendant's] breach, or failure to do what the contract required, caused a loss to the plaintiff."

*Tracey v. Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 342 (D.N.J. 2020) (alterations in original) (quoting *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (2016)).

i.  <u>"Resale Price Maintenance" and the Alleged Invalidity of the Agreement</u>

The parties do not dispute the terms of the contract. Njoku, however, objects to Jackson Hewitt's having calculated royalty fees based on a fixed average fee of $250 for certain returns, rather than on the actual discounted prices that Mr. Njoku had charged his customers. (DE 23 at 14). Njoku argues in addition that Jackson Hewitt engaged in illegal vertical price fixing in the form of resale price maintenance ("RPM"). (DE 28 at 14-15). Therefore, contends Njoku, the franchise agreement as applied by Jackson Hewitt is unenforceable, which renders Jackson Hewitt's claims unactionable as a matter of law. (DE 23 at 16). I disagree.

The background of the RPM claim is this. Jackson Hewitt submitted evidence of its audit showing that Njoku was underreporting or not reporting his revenue while operating his former franchise, resulting in his underpayment of fees and royalties.[5] In this regard, I find Gwathney's testimony credible. Gwathney submitted a declaration, and likewise testified in Court, that "Jackson Hewitt's audit process revealed that Njoku was both underreporting the actual amounts he charged customers and performing

---

[5]      Pursuant to the franchise agreement, Mr. Njoku was required to pay Jackson Hewitt "royalty fees equal to fifteen percent (15%) of [his] Gross Volume of Business." (Franchise Agreement § 5.1). Gross Volume of Business is defined as the franchisee's total revenue, "including revenue from returns prepared for individuals." (Franchise Agreement Definitions). Thus, Mr. Njoku's royalty fees were determined based on the total revenue he earned, including revenue earned from individual tax returns. The issue here, however, is not damages, or even wrongful termination. I raise these issues in connection with Mr. Njoku's defenses to the application for preliminary injunctive relief based on violations of Njoku's post-termination obligations under the franchise agreement.

returns outside [Jackson Hewitt's] system in order to avoid paying Royalties and Marketing and Advertising Fees." (Gwathney Decl. 2 ¶¶ 9,14). When confronted by Jackson Hewitt, Njoku "refused to provide Jackson Hewitt with access to his bank statement for the 2017 through 2019 Tax Seasons and refused to provide Jackson Hewitt with the requested documents relating to EFIN application for the 2016 through 2019 Tax Seasons, despite multiple requests." (Gwathney Decl. 2 ¶10). Additionally, Jackson Hewitt sent an undercover person to pose as a customer (described picturesquely as a "mystery shop of Njoku's location"). With respect to that undercover customer, Njoku underreported the amount charged and applied an inappropriate fee adjustment. (Gwathney Decl. 2 ¶12 & Ex. C). This undercover transaction corroborates the conclusion of the audit that Njoku had a practice of underreporting revenues.[6]

When an audit reveals underreported revenue, "and a franchisee does not provide sufficient information to determine the amount of underreported revenues, Jackson Hewitt calculates amounts owed using the franchisee's own Average Net Tax Preparation Fee for each respective Tax Year included in the scope of the audit." (Gwathney Decl. 2 ¶14). Additionally, via email, Njoku himself agreed that Jackson Hewitt should apply the average fee to the discounted returns for which Njoku could not supply any explanation or amount.[7] (DE 25-5 at 2). That is what occurred here.

More specifically, that, and not "vertical price fixing," is what occurred here. Jackson Hewitt does not require that its franchisees charge any

---

[6]   Gwathney also testified that Njoku admitted to underreporting his revenue in the course of the audit. (Gwathney Decl. 2 ¶¶11, 14). The evidence is sufficient without the necessity of a finding on that particular point.

[7]   In the course of the audit, it emerged that Njoku did not necessarily maintain complete records. He supplied information about discounted amounts charged for some, but not all, returns. In an email to Gwathney, Njoku agreed as follows: "For the ones with no explanation, I couldn't remember how much I collected. So you can use average fee." (Email, 8/20/2019 (Gwathney Decl. 2 Ex B, DE 25-5 at 2).) And that is what Jackson Hewitt did. Needless to say, amounts collected should not be a matter of

particular amount. (Franchise Agreement § 9.15). Indeed, I find that Jackson Hewitt did not even require that Njoku himself charge a particular amount. The claim of resale price maintenance is an unwarranted extrapolation from Jackson Hewitt's use—with Njoku's consent—of an average figure to calculate fees that Njoku owed on returns for which he could supply no record of the discounted amount he had charged.[8] Therefore, I reject Njoku's contention that the franchise agreement is unenforceable, and that Jackson Hewitt is therefore the party in breach.

### ii.   Breach of Non-competition Covenant

Having rejected Njoku's contention that the franchise agreement is invalid and unenforceable as a whole, I consider whether Njoku breached it in a manner that would support forward-looking injunctive relief. I find that Njoku's conduct did breach the post-termination covenants under the franchise agreement.

I will start with the covenant not to compete. Njoku does not dispute that in 2020 he operated a competing tax business in Highbridge, and that in 2021,

---

what the preparer can "remember" charging; a tax professional can reasonably be expected to keep accurate records, if only for purposes of his own taxes.

[8]   Under federal law, resale price maintenance is not illegal *per se*, but must be analyzed under the rule of reason. *State Oil Co. v. Khan*, 522 U.S. 3 (1997) (reversing prior case law finding it to be a *per se* Sherman Act violation). A resale price maintenance claim is therefore a complex, fact-intensive cause of action.

Defendant submits that the law governing RPMs is the same under New Jersey and New York law. Njoku concedes that, under New York law, RPMs are not *per se* illegal. (DE 23 at 15-16 (citing *People v. Tempur-Pedic, Inc.*, 95 A.D. 3d 539, 540 (N.Y. App. Div. 1st Dep't 2012)). Under New Jersey law, at a minimum an agreement setting resale prices is required. *See* N.J. Stat. Ann. § 56:4-1.1. Paralleling federal law, New Jersey holds that "[a] vertical restraint is not per se illegal . . .unless it includes some agreement on price or price levels." *Id.* (second alteration in original) (internal quotation marks omitted) (quoting *Business Electronics Corporation v. Sharp Electronics Corporation*, 485 U.S. 717 (1988)).

Plaintiff here gestures toward such a claim, without any significant attempt to make the necessary showing. There is no agreement regarding resale prices—only to use an average rate to calculate the fees that Njoku owes Jackson Hewitt in cases where he did not keep records of and report the actual amount he charged, as he was required to do.

he resumed operation of his tax preparation business at his former franchise location in East Elmhurst. Both operations were conducted within two years of his 2019 termination and within ten miles of his former franchise location, in violation of the franchise agreement. (Harrison Decl. ¶¶25-26; Edidong Njoku Dep. at 15).

Here again, Njoku does not really offer substantial proof that he did not violate the post-termination restrictions; rather, he suggests that the provisions he clearly violated are unreasonable in scope and therefore unenforceable. The post-termination restrictions in the agreement, he says, are unreasonable "because the requested injunction would effectively make it entirely impossible for Mr. Njoku to earn a living in the field that has been the sole source of his income for well over a decade." (DE 23 at 21). Njoku further submits that ten-mile radius restriction constitutes "overbreadth" in limiting Njoku's ability to service "an area that encompasses millions of people, and includes swaths of not only Queens but Manhattan, Brooklyn, and the Bronx as well." (*Id.*).

Under New Jersey law, in an employment context, a covenant not to compete "will generally be found to be reasonable where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." *Jackson Hewitt Inc. v. Childress*, 2008 WL 199539, at *7 (D.N.J. Jan. 22, 2008) (internal quotation marks omitted) (quoting *Solari Indus., Inc. v. Malady*, 576, 264 A.2d 53 (1970)).

A court in this District has upheld a substantially similar Jackson Hewitt covenant not to compete under a franchise agreement. *See Childress,* 2008 WL 199539 at *7-9. *Childress* first held that Jackson Hewitt's covenant not to compete protects its legitimate interests, including "the protection of trade secrets, confidential information and customer relationships." *Id.* at 7 (citing *Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577 (N.J. 1971); *A.T. Hudson & Co. v. Donovan*, 524 A.2d 412 (N.J. Super. Ct. App. Div. 1987)). I find no reason to depart from that holding. Jackson Hewitt has a legitimate interest in maintaining its customer base after a franchisee has departed from an area.

*See id.* ("The crux of the covenant not to compete is to provide JHI with an opportunity to transfer former franchisees' customers, such as Defendant, to alternative JHI franchisees upon the termination of franchise agreements and, thereby, preserve JHI's client base."). Jackson Hewitt reasonably established as a matter of fact that those interests exist and are served by the post-termination restrictions in its franchise agreement. (Harrison Decl. ¶39).

Second, the *Childress* court held that the covenant imposed no undue hardship on the former franchisee:

> JHI's covenant not to compete imposes no undue hardship on Defendant. In section 18.7 of the Franchise Agreements, Defendant expressly acknowledged that the restrictions contained in the covenant not to compete in section 18 were reasonable and necessary to protect JHI and its franchise system and the restrictions would not impose any undue hardship on Defendant. Moreover, the restrictive covenant is reasonable because it imposes only a two-year time restriction and a ten-mile radius geographical restriction with respect to the Territories.

*Id.* at *7.

Similarly, here, Njoku acknowledged by signing the franchise agreement that these terms were reasonable and necessary. (Franchise Agreement § 18.7). He further acknowledged that he possesses "other skills, experience or education that will afford [him] the opportunity to derive income from other endeavors." (*Id.*). Indeed, at the hearing Njoku acknowledged that he engages in notary services, as well corporate tax preparation services that are not covered by the non-compete provision. Also open to him, of course, is the operation of an individual tax preparation business outside the proscribed ten-mile radius.[9]

Here, as in *Childress*, the covenant imposes a limited two-year time restriction and a ten-mile-radius geographical restriction. (Harrison Decl. ¶28; Franchise Agreement § 18.2). Like the *Childress* court, I find that those

---

[9]     Njoku also owns a residential building containing two rental units, although he states that the tenants have stopped paying during the COVID-19 crisis and moratorium on evictions.

restrictions do not, in general, impose a hardship that is undue or disproportionate to Jackson Hewitt's legitimate interests. *See* 2008 WL 199539 at *7. Indeed, Njoku testified that he prepared tax returns for individuals well beyond the ten-mile radius of his East Elmhurst office, including individuals located in Florida, Georgia, Tennessee, Ohio, North Carolina, Kansas, and California. Njoku retained about 60% of his former customers while operating his Highbridge office, which is eight miles (*i.e.* two miles shy of the restriction) from his East Elmhurst office. That retention rate severely undercuts any argument that customers who wished to retain his services would not do so at a distance of ten, as opposed to eight, miles.

Finally, *Childress* held that Jackson Hewitt's covenant was not injurious to the public because there were "undoubtedly ample tax return preparation businesses in the area," and that "even if the protected area spanned beyond the ten mile protected area here, the community members could still easily access Defendant's services." 2008 WL 199539 at *8. The same reasoning applies here. There are two Jackson Hewitt locations within three miles of Njoku's former East Elmhurst location, nine locations within five miles of the former franchise location, and a total of about fifty locations within ten miles of Njoku's former location. (Doorly Decl. 2 ¶16). And, again, at least 60% of Njoku's customers were willing to travel eight miles to retain his services. Additionally, as evidenced by his out-of-state customers, some are willing to use his services from afar. The non-compete provision, then, has little if any tendency to reduce the availability or raise the cost of tax preparation services to the public.

In light of the above, I find the non-compete provision is reasonable and enforceable. Njoku makes no serious argument that his actions do not violate that provision, assuming it is enforceable. Therefore, Jackson Hewitt is likely to success on the merits of its breach of contract claim with respect to the non-compete provision.

### iii.   Breach of Non-solicitation Covenant

I turn now to the claims regarding non-solicitation and find they are likely to succeed on the merits as well.

Gwathney testified, based on his familiarity with ERO data, that tax returns filed under Ms. Njoku's EFIN in 2020 were likely the same customers whose returns were prepared by Njoku's EFIN in 2018 and 2019. (Gwathney Decl. 1 ¶6). Njoku's 60% retention rate of customers demonstrates a substantial likelihood that Njoku violated the non-solicitation provision. Njoku testified that he stopped using his former Jackson Hewitt telephone number or email address. He testified that his former customers had reached out for him, and not the other way around, but had no explanation for how this could have occurred. I find his testimony unconvincing in this regard.

Also highly suspicious is Mr. Njoku's testimony that he retained client records because Doorly did not want them, or because he was allegedly required to do so under New York law. His post-hoc explanations are unconvincing. (*See* n.4, *supra*.) I find it far more likely that Mr. Njoku retained the records in an attempt to maintain access to his former Jackson Hewitt customers.

*          *          *

Given the above, I find prong one—likelihood of success on the merits of the contract breach claim—satisfied.

### c. **Prong two: Irreparable harm**

Jackson Hewitt has established that it will suffer irreparable harm if the non-compete and non-solicitation covenants are not enforced.

Harm is considered "irreparable" if it is not redressable by money damages at a later date, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir.1989) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1964)). Jackson Hewitt submits that it will suffer irreparable harm without a preliminary injunction due to loss of control of reputation, business opportunities, and good will. (DE 4-1 at 24). In the Third

Circuit, such losses constitute irreparable injury. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will.") (internal quotation marks omitted) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir.1998)).

Njoku submits that Jackson Hewitt's concerns about maintaining customers in East Elmhurst is belied by the fact that, in the year and a half since termination of the franchise agreement, Jackson Hewitt has not replaced Njoku with a different franchisee. However, there are about fifty Jackson Hewitt locations within ten miles of the East Elmhurst location. (Doorly Decl. 2 ¶16). I find that Njoku's retention of customers would have impeded Jackson Hewitt's ability to transition them to one or more of the fifty franchise locations located near the East Elmhurst location. That in itself constitutes irreparable harm. *See ADP, LLC v. Trueira*, No.18-3666, 2018 WL 3756951, at *25 (D.N.J. Aug. 8, 2018) ("New Jersey courts recognize that 'the diversion of a company's customers may [ ] constitute irreparable harm, [and that] [t]his is so because the extent of the injury to the business as a result of this type of conduct cannot be readily ascertained, and as such, does not lend itself to a straightforward calculation of money damages.'") (alterations in original) (quoting *Fluorarnics, Inc. v. Trueba*, No. 408-05, 2005 WL 3455185, at *8 (N.J. Super. Ct. Ch. Div. Dec. 16, 2005)).

Njoku also submits that Jackson Hewitt cannot establish irreparable injury, given its delay in filing this action. (DE 23 at 23). Njoku's franchise agreement was terminated in November 2019. (DE 4-4 (Termination Notice)). Jackson Hewitt inspected the former franchise location in January 2020. (Doorly Decl. 2 ¶4). Jackson Hewitt filed its complaint on March 31, 2021. (DE 1). That timeline, argues Njoku, "undercuts [Jackson-Hewitt's] recently-minted claim of irreparable harm." (DE 23 at 23).

It is true that courts in this district have found irreparable harm lacking where the plaintiff delayed filing for injunctive relief without providing an

adequate explanation. *PTT, LLC v. Gimme Games*, No. 13-7161 JLL J, 2014 WL 5343304, at *3 (D.N.J. Oct. 20, 2014) ("Plaintiff has not demonstrated any current harm or alternatively, that it will be harmed, without the issuance of an injunction. Most telling perhaps, is the fact that Plaintiff was aware of Defendants' alleged breach in September of 2013. Plaintiff then waited *two months* before commencing the instant cause of action in November 2013, and about *eleven months* before filing the instant application for injunctive relief. Plaintiff fails to provide an adequate explanation for this delay."); *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, 2006 WL 892718, at *12 (D.N.J. Apr. 4, 2006) ("Where a Plaintiff delays in seeking preliminary injunctive relief, such delay is evidence that speedy relief is not needed"); *Pharmacia Corp. v. Alcon Labs, Inc.*, 201 F. Supp. 2d 335, 383 (D.N.J. 2002) ("Such a delay—one full year—knocks the bottom out of any claim of immediate and irreparable harm").

Here, however, Jackson Hewitt explained that as of January 2020 it reasonably believed that Njoku was complying with the post-termination covenant. *See Kos Pharm.*, 369 F.3d at 727 (concluding that, in a trademark action, the defendant's submission of alternate names to the Food and Drug Administration and to the Patent and Trademark Office "could reasonably be understood as a suggestion by [defendant] that the matter might be resolved absent a lawsuit."). For example, after receiving the cease-and-desist letter, "Njoku removed the Jackson Hewitt exterior signage" from his former franchise location. (Harrison Decl. ¶36; *see also* Doorly Decl. 2 ¶6). Further, Njoku informed "Jackson Hewitt that he had returned or destroyed all client files." (Harrison Decl. ¶36).

The full ERO data for 2020 did not become available until December 2020. (Gwathney Decl. 1 ¶4). It emerged that Njoku used an EFIN associated with his wife's name rather than his own. Ms. Njoku testified that she created the EFIN in 2019 or early 2020 (Edidong Decl. at 13), around the time Njoku's franchise agreement was terminated. Because Ms. Njoku, a nurse, is not in the

business of preparing tax returns, I find unconvincing Mr. Njoku's explanation that they obtained an EFIN in her name for convenience. It appears more likely that, at least in part, Mr. Njoku's motivation was to avoid or delay detection.

In light of the above, I find that any delay in seeking relief is excused by Jackson Hewitt's inability to discover the scope of Njoku's breach. I have, however, equitably adjusted the duration of the injunction in light of this and other factors. *See* Section IV, *infra*.

I find that prong two, irreparable harm, is satisfied.

### d. Prong three: Potential harm to Njoku

Njoku submits that a preliminary injunction would cause him to suffer significant harm because, "Njoku, who has a wife and children, would be barred from his sole means of livelihood" and would be prevented "from engaging in the field of endeavor to which he has exclusively devoted his career for roughly fifteen years." (DE 23 at 26).

First, I note that Ms. Njoku is employed as a full time nurse and is therefore not entirely dependent on Njoku's income. (Edidong Njoku Dep. at 9). Second, Mr. Njoku testified that he provides services not covered by the non-compete provision, including the provision of notary services and corporate tax preparation. I also note that Njoku has the potential to earn residential income from at least two units. Moreover, Njoku is free to engage in income tax preparation services outside the ten mile radius. Again, if 60% of his customer base followed him the eight miles to Highbridge, it is not much of a stretch to believe they would follow him two miles more. Finally, although I do not give boilerplate recitals undue weight, Njoku did expressly acknowledge in advance that the non-compete provision was reasonable and would not impose an undue hardship. (Franchise Agreement § 18.7).

Therefore, I find prong three, the countervailing harm to Mr. Njoku, does not weigh heavily against imposing the preliminary injunction.

### e. Prong four: Potential harm to public interest

Jackson Hewitt submits that issuance of the injunction will benefit the public interest in (1) protecting against deception and confusion as to Jackson

23

Hewitt's sponsorship of Njoku's income tax preparation business and (2) protecting the parties' contractual expectations. I find both interests valid. *See, e.g., AAMCO Transmissions, Inc. v. Dunlap*, 646 F. App'x 182, 184 (3d Cir. 2016) (affirming district court's holding "that a permanent injunction would be in the public interest in that it would prevent confusion and deception among business customers regarding whether [defendant's] repair shop is, in fact, an approved [plaintiff] franchise."); *Jackson Hewitt, Inc. v. JSE Bus. Dev. Grp.*, No. 09-5968, 2009 WL 5205983, at *4 (D.N.J. Dec. 23, 2009) ("[T]here is no doubt that the public has an interest in upholding freely negotiated and reasonable business contracts.").

However, Njoku also raises a potential harm to the public interest: Njoku's customers, many of whom are not well-to-do, rely on Njoku for the preparation of their tax returns, and the extended IRS filing deadline is less than two weeks away. (DE 23 at 27). Many customers are entitled to tax refunds that make a substantial difference in their economic wellbeing. Their livelihood is a significant public interest that may be harmed by prematurely imposing the preliminary injunction, particularly in the current context of the COVID-19 pandemic. I will therefore tailor the injunction to avoid interference with the filing of returns on behalf of existing customers that are due by May 17, 2021.

## IV.    Scope of Injunction

Based on the Court's balancing of the four factors, a preliminary injunction is warranted. I will, however, make some equitable adjustments.

For the equitable reasons stated above, the injunction will not take effect until **5/18/2021**, the day after this year's tax filing deadline. *See Tax Day For Individuals Extended To May 17: Treasury, IRS Extend Filing and Payment Deadline*, IR-2021-59, 2021 WL 1022431, at *1 (Mar. 17, 2021) (announcing "that the federal income tax filing due date for individuals for the 2020 tax year will be automatically extended from April 15, 2021, to May 17, 2021."). The injunction will run from that date, assuming that Njoku begins complying. *See*

*Childress*, 2008 WL 834386 at *11 (extending injunction for twenty-four months beginning on the date of compliance with the covenant not to compete); *Jackson Hewitt, Inc. v. DJSG Utah Tax Serv., LLC*, No. 10-05108, 2013 WL 2459887, at *2 (D.N.J. June 6, 2013) ("This Court was justified in extending the injunction beyond the terms of the franchise agreement because Defendants, and those acting in concert with them, actively engaged in competition in violation of the franchise agreements and the Court's injunctions.") (citing *Childress*, 2008 WL 834386 at *11).

I will impose an injunction of eighteen months , rather than two years, based on several equitable factors. The first factor is Jackson Hewitt's delay, albeit with some justification, in initiating this action. *See* Section III.c, *supra*. If complied with, the post-termination restrictions would have ended in November of this year (two years from the termination of the franchise agreement). Mr. Njoku has been engaged in a competing tax business since at least as early as January 2020; that fact should not have been difficult to ascertain, even if the full scope of his activities could not have been known immediately. Jackson Hewitt did not request preliminary restraints until April 2021. A second, related factor is Mr. Njoku's imperfect compliance with post-termination restrictions since November 2019. If not obedient, he was not exactly defiant, either. He did remove Jackson Hewitt signage. He did close down the Elmhurst office and move—not 10 miles away, but 8.4 miles away, in a highly populous urban environment containing many other Jackson Hewitt locations. A third, more general factor is the general hardship of the COVID-19 pandemic, a universally shared burden that could not have been anticipated when the agreement was signed. Mr. Njoku introduced evidence of particular hardship in the form of, e.g., inability to exploit at least one alternative source of income, his rental property.

## V.    Conclusion

For the reasons set forth above, I will enter an order:

(1) preliminarily enjoining and restraining defendant Collins Njoku, and his relatives, employees, agents, servants and/or representatives, and all those who act in concert or participation with them, from preparing or electronically filing individual income tax returns, offering financial products, or participating in any way in a competing tax business within the territory under Njoku's terminated franchise agreement, and within ten miles of the boundaries of the territory under the terminated franchise agreement, until **eighteen months** from the date of **May 18, 2021**; and

(2) preliminarily enjoining and restraining Njoku, and his relatives, employees, agents, servants, attorneys and/or representatives, and all those who act in concert or participation with them, from soliciting any persons who were customers of Njoku's former franchised Jackson Hewitt location at the time of termination or during the year prior to termination of the franchise agreement, until **eighteen months** from the date of **May 18, 2021**.

An appropriate order follows.

Dated: May 6, 2021

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

26